```
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------       11-46867 (CEC)
In Re:

MAN KIT NG,
                              Debtor.
------------------------------------------------------------       12-01343 (CEC)
ROBERT L. GELTZER, as Trustee of the
Estate of MAN KIT NG,
                              Plaintiff,
       -against-

MAN KIT NG,
                              Defendant.
------------------------------------------------------------x
```

## DECLARATION OF FACTS

I, ROMAN LEONOV, pursuant to 28 USC § 1746, submit the following declaration:

1)    I am an attorney admitted to practice law within this Eastern District of New York. I make this declaration to explain the facts and circumstances I witnessed at an attempted deposition of the Debtor/Defendant in the above-captioned action.

***My relationship to the case***

2)    I am a colleague of Mr. Karam Dahiya, who, upon my personal knowledge and inquiry into the EDNY Bankruptcy Court Pacer System[1], represents the Debtor/Defendant ("Mr. NG") in the above captioned action.

3)    Several days before the scheduled deposition, which was, as I recall, and refresh via PACER at docket # 31, ordered pursuant to Rule 2004 of the Bankruptcy Code, Mr. Dahiya asked for my assistance as co-counsel and attend the deposition.

---

[1] An internet resource system available at https://ecf.nyeb.uscourts.gov/

4) Although I have not formally appeared at the case, I did however appear at Mr. Geltzer's office for the deposition, in order to be aware of the facts so that I could be effective in my possible capacity as co-counsel for litigation.

5) That experience however, resulted in one of the most unique and peculiar experiences of my legal career in terms of depositions and methods of examinations, the details of which are set forth below.

*Meeting the Client*

6) I first met Mr. NG at Mr. Dahiya's office, from which we set our destination for the deposition to Mr. Geltzer's office.

7) While trying to get some facts from Mr. NG, I realized that he was either nervous, unable to communicate English, or whether one was the cause for the other.

8) At the outset Mr. NG, appeared to be confused as to the subject matter questions from myself or of Mr. Dahiya.

9) While Mr. NG could answer if given time, he seemed entirely disoriented in terms of his ability to answer the questions with any sort of a responsive sentence as his answered changed from "yes" to "no" within 5 minutes of being asked the same exact question regarding his case.

10) In any event, along with Mr. NG, and Mr. Dahiya, I made my journey to Mr. Geltzer's office.

*Rule 2004 deposition*

11) Once we arrived at the office and made our way up to the door Mr. Geltzer was more than happy to meet us right upon arrival, and also certainly happy to not have forgotten his digital recording device, and informing, without even a hello, that "we are on the record".

12) From the moment of opening the door, Mr. Geltzer's intent of creating discomfort was modest only at its apparent extremism; Before even having a chance to state any of our appearances, the examination has begun, and, upon my recollection, Mr. NG. was slightly shaking in his seat, and was told to stop.

13) At that point, after calming down Mr. NG and explaining to Mr. Geltzer that a translator was necessary, a very weird set of events occurred… Specifically:

   a. While Mr. Dahiya was holding his telephone in his hands, Mr. Geltzer became very worried whether Mr. Dahiya was using it as a recording device.

   b. Next, since Mr. Getlzer's office was quite warm compared to the cold temperatures outside, I took off my coat for respect, and physical needs. While my coat was folded, Mr. Geltzer, again, asked me whether I was using my phone to record the examination. Without any ability to respond otherwise, I took out my mobile device, explained that it was not in use, and even took out the battery.

   c. Not within a longtime from these events, despite Mr. Dahiya's request for a translator, and Mr. Geltzer's acknowledgement of such entitlement, Mr. Geltzer asked whether Mr. NG can answer just a few questions, and the examination went forward.

   d. Mr. NG made zero sense to me in his answers… He was more questions about his English ability than the case, and did his best to stay positions. In my opinion, he was more focused on the suddenly-imposed examination from the doorstep rather than his mind.

   e. In any event, at one point, Mr. Geltzer became slightly enraged when I personally explained to him that this was a Rule 2004 deposition, and nothing more, and, at one point, was about to exclude me from the room.

14) Personally, I was, and am aware of Mr. Geltzer's duties, and, while I do respect the uniquely aggressive nature of his administration, I am of the opinion that the conduct on the Rule 2004 administration obtained no benefit to the estate other than frustration of the debtor/defendants.

15) As I can best recall this date, eventually, the deposition ended, and we left without any material facts being discovered. I also eventually never appeared as co-counsel to Mr. Dahiya.

*Motion for sanctions*

16) I am now informed that there is a motion by Mr. Geltzer against Mr. Dahiya for sanctions. I have seen the motion, but did not read it fully. I understand that the above-mentioned facts have something to do with it, or a part of it.

17) To say the least, I am surprised that Mr. Geltzer would base a motion for sanctions based on delay, while at the very least, he himself caused such delay.

18) I strongly, and respectfully hope that Mr. Geltzer's motion be denied, and the Debtor/Defendant be allowed a proper defense, and a chance at a constitutional discharge.

Dated: New York , New York
October 14, 2013

Roman Leonov